**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| BRANDON MOODY, | : | Civil No. 3:18-cv-53 |
| Plaintiff | : | (Judge Mariani) |
| v. | : | |
| JOHN WETZEL, *et al.*, | : | |
| Defendants | : | |

# MEMORANDUM

Plaintiff Brandon Moody ("Moody"), a state inmate in the custody of the Pennsylvania Department of Corrections ("DOC"), initiated this action pursuant to 42 U.S.C. § 1983. The matter is proceeding via a second amended complaint. (Doc. 45). Moody alleges that Defendants violated his rights under the First, Eighth, and Fourteenth Amendments of the United States Constitution, and he brings claims under Title II of the Americans with Disabilities Act, and state law claims including a violation of 37 Pa. Code 93.11 § B and malicious abuse of process. (*Id.*). Moody's allegations relate to his placement on the Restricted Release List ("RRL"). (*Id.*). Named as Defendants are Secretary John Wetzel, Executive Deputy Secretary Shirley Moore-Smeal, and Eastern Regional Deputy Secretary Michael Wenerowicz. (*Id.*).

Presently before the Court is Defendants' motion for summary judgment pursuant to Federal Rule of Civil Procedure 56. (Doc. 203). The motion is ripe for resolution.[1] For the reasons set forth below, the motion will be granted in part and denied in part.

## I. Statement of Undisputed Facts[2]

Background and Misconducts

Moody entered into the custody of the Department of Corrections in July 2008. (Doc. 204 ¶ 1).

In August 2008, Moody was reported as not requiring mental health services at that time. (*Id.* ¶ 2). It was noted that he had anger management problems, poor institutional adjustment, multiple misconducts, a history of impulsivity, and denial, lack of remorse, and poor insight. (*Id.*).

In October 2008, Moody was charged twice with refusing to obey orders and was sanctioned to 30 days of disciplinary custody for each charge. (*Id.* ¶ 3).

---

[1] Although Moody failed to provide opposition to Defendants' motion for summary judgment, the Court may not grant summary judgment merely on the basis that the motion is unopposed. *Stackhouse v. Mazurkiewicz*, 951 F.2d 29, 30 (3d Cir. 1991). Rather, the Court must still ascertain whether Defendants have satisfied their burden of establishing the nonexistence of a "genuine issue." *Celotex Corp. v. Catrett*, 477 U.S. 317, 330 (1986).

[2] Local Rule 56.1 requires that a motion for summary judgment pursuant to Federal Rule of Civil Procedure 56 be supported "by a separate, short, and concise statement of the material facts, in numbered paragraphs, as to which the moving party contends there is no genuine issue to be tried." M.D. PA. LOCAL RULE OF COURT 56.1. A party opposing a motion for summary judgment must file a separate statement of material facts, responding to the numbered paragraphs set forth in the moving party's statement and identifying genuine issues to be tried. *Id.* Unless otherwise noted, the factual background herein derives from Defendants' Rule 56.1 statement of material facts and exhibits. (Docs. 204, 206, 207).

In October 2009, Moody was charged with lying to staff, and loaning or borrowing property, and was sanctioned to a cell restriction for 20 days. (*Id.* ¶ 4).

In February 2010, Moody was charged with fighting and refusing to obey an order and was sanctioned with 60 days of disciplinary custody. (*Id.* ¶ 5).

In May and July of 2010, despite being in a restricted housing unit, Moody was charged with refusing to obey multiple orders and was sanctioned to disciplinary custody. (*Id.* ¶ 6).

In July 2010, Moody was transferred to SCI-Coal Township. (*Id.* ¶ 8; Doc. 207-3, at 51).

In October 2010, Moody was charged with refusing to obey an order and was sanctioned to disciplinary custody. (Doc. 204 ¶ 7).

On November 2, 2011, it was reported that Moody threatened staff and demanded a single cell and stated that if he was not given a single cell, he would "take one[.]" (*Id.* ¶ 9). When asked to clarify, Moody responded with "you know what I mean" and stood up and refused to answer any further questions or orders. (*Id.*).

In November 2011, despite being in restricted housing, Moody was charged twice with refusing to obey orders and was sanctioned to 90 days of disciplinary custody, 90 days suspension/removal from his job, 45 days of disciplinary custody, and 90 days suspension/removal from his job. (*Id.* ¶ 10; Doc. 207-3, at 32-33).

On January 18, 2012, Moody was seen by a provider and his concerns were forwarded to psychiatry. (Doc. 204 ¶ 11).

In June 2012, Moody was charged with assault and was sanctioned to 90 days of disciplinary custody. (*Id.* ¶ 12).

In July 2012, Moody was charged with assaulting another inmate and was sanctioned with 90 days of disciplinary custody. (*Id.* ¶ 13).

On October 10, 2012, Moody was noted as being on the schedule to see psychiatry to discuss his medication. (*Id.* ¶ 14).

On October 22, 2012, Moody was informed that he was denied a Z Code and single cell status. (*Id.* ¶ 15).

On November 11, 2012, at SCI-Coal Township, Moody was charged with assaulting a sergeant, threatening staff, and refusing to obey an order with other charges. (*Id.* ¶ 16). Moody was transferred out of the institution, went to SCI-Camp Hill, and spent time in the Restricted Housing Unit ("RHU") at SCI-Camp Hill. (*Id.* ¶ 17).

The sergeant attacked by Moody was hospitalized and remained in the Intensive Care Unit ("ICU") for two days. (*Id.* ¶ 18). Moody received a total of 21 months of disciplinary time, beginning on November 15, 2012, as a cumulative result of the series of events that led up to the altercation. (*Id.* ¶ 19). As a result of the November 2012 assault of the sergeant, Moody was charged with simple assault in the Court of Common Pleas of

Northumberland County at Criminal Docket No. CP-49-CR-0000427-2013. (*Id.* ¶ 20). Moody pled guilty to the simple assault charge. (*Id.*).

On November 28, 2012, Moody was seen for his 30-day mental health review, where he reported he was okay, and staff noted he would be monitored per DOC policy. (*Id.* ¶ 21).

On December 12, 2012 and December 20, 2012, it was noted that Moody asked if he would get a Z Code for a single cell to himself. (*Id.* ¶ 22).

On December 27, 2012, Moody was referred to psychiatry. (*Id.* ¶ 23). The next day, he was seen for his 60-day mental health review. (*Id.* ¶ 24).

<u>Placement</u>

At a Program Review Committee ("PRC") meeting on January 24, 2013, Moody was notified that he was placed on the Restricted Release List. (*Id.* ¶ 25).

RRL is a type of administrative custody for inmates who pose a threat to the secure operation of the facility and where a transfer to another facility or jurisdiction would not alleviate the security concern. (*Id.* ¶ 26). Criteria include assaultive history, escape attempts, and threats to the orderly operation of a facility. (*Id.* ¶ 27).

Moody did not know who recommended him for RRL placement but learned from the Superintendent that Wetzel had approved of the recommendation. (*Id.* ¶ 28). Moore-Smeal signed as recommending Moody for placement on the RRL. (*Id.* ¶ 29). A packet of documents was reviewed by Wetzel with various documents supporting the recommendation to place Moody on the RRL, and Wetzel approved it on January 16, 2013.

(*Id.* ¶ 30). The packet repeatedly included references to Moody being a C Roster inmate ("C Code"). (*Id.* ¶ 31). Inmates on the C Roster are receiving treatment, may or may not be taking psychiatric medication, and are not currently diagnosed with a serious mental illness as defined by DOC policy. (*Id.* ¶ 32).

Inmates on the D Roster are diagnosed as seriously mentally ill per DOC policy. (*Id.* ¶ 33).

Defendants' Involvement

Wetzel was the final decision maker with regard to Moody's placement and continuation on the RRL. (*Id.* ¶ 34). Moody never met Wetzel in person and only interacted with him in writing. (*Id.* ¶ 35).

In September 2012, Moody filed a lawsuit in the Commonwealth Court of Pennsylvania, Docket Number 604 MD 2012. (*Id.* ¶ 36). The case was transferred to the Northumberland Court of Common Pleas Court to Docket Number 13-cv-886. (*Id.*). Wetzel was named as a defendant in this action, and Moore-Smeal and Wenerowicz were not named as defendants. (*Id.* ¶ 37). Moody received notice that the lawsuit was transferred, and several weeks after that, he learned at the PRC meeting that he was placed on the RRL. (*Id.* ¶ 38).

At his deposition, Moody testified that he believes Wenerowicz and Moore-Smeal retaliated against him due to his prior lawsuits. (*Id.* ¶ 39). Moody also testified that he does not think Wenerowicz was the one who recommended him for RRL placement. (*Id.* ¶ 40).

Moody saw Moore-Smeal in person at SCI-Frackville. (*Id.* ¶ 41). Moody saw Wenerowicz in person around that same time after he became the Eastern Regional Deputy Secretary. (*Id.* ¶ 42). Moody did not have other direct interactions with Moore-Smeal or Wenerowicz. (*Id.* ¶ 43).

Wetzel and Moore-Smeal did not mention Moody's prior lawsuit to him. (*Id.* ¶ 44; Doc. 206-1, at 31:5-11).

Conditions in Restricted Housing

Moody was diagnosed with Anti-Social Personality Disorder. (Doc. 204 ¶ 45). Moody had contact with mental health staff with visits at his cell on a periodic basis, per DOC policy. (*Id.* ¶ 46). Mental health staff responded when Moody initiated requests to see them. (*Id.* ¶ 47). Moody's medications were changed multiple times while on the RRL. (*Id.* ¶ 48). Mental health staff checked on Moody to see if the medications prescribed were helping or if changes needed to be made. (*Id.* ¶ 49). Mental health staff noted that they tried to help Moody process his feelings. (*Id.* ¶ 50). On some occasions, Moody was pulled out of his cell to meet with mental health staff. (*Id.* ¶ 51).

Around five or six times, Moody was admitted to a psychiatric observation cell ("POC") for suicidal or self-harm tendencies such as hoarding his medication, a hunger strike, or mutilating himself. (*Id.* ¶ 52). When admitted to the POC, he remained for at least three days but stayed as long as two or three weeks for observation and close monitoring. (*Id.* ¶ 53).

Moody was noted as overreporting the extent and severity of his psychopathology and was previously diagnosed with malingering and noncompliance with treatment. (*Id.* ¶ 54).

Moody had access to medical treatment while on the RRL. (*Id.* ¶ 55).

While in the RHU, Moody was strip-searched prior to exiting his cell and when returning to his cell. (*Id.* ¶ 56).

Moody was afforded in-person, non-contact visitation while in restricted housing in an area with a glass partition to separate him from his visitor, and while restrained. (*Id.* ¶ 57).

On February 24, 2016, Moody was permitted weekly phone calls. (*Id.* ¶ 58). Wetzel authorized the practices set forth in DC-ADM 801, DC-ADM 802, and DC-ADM 13.8.1 for the versions that were issued during his tenure. (*Id.* ¶ 59).

Moody was noted as refusing out of cell time and refusing to interact with psychiatry. (*Id.* ¶ 60).

<u>Appeal and Review Process</u>

Moody diligently tried to appeal the RRL placement and got a response from the Central Office. (*Id.* ¶ 60).

After Moody's placement on the RRL, the PRC met regularly with Moody every 30-90 days, which provided him additional opportunities to speak regarding his RRL placement.

(*Id.* ¶ 61). Moody's placement on the RRL was reviewed by Wetzel and other executive staff on a periodic basis, pursuant to DOC policy. (*Id.* ¶ 62).

In March 2013, Moody was charged with threatening staff and using abusive language and was sanctioned to 120 days of disciplinary custody and 90 days of disciplinary custody. (*Id.* ¶ 64).

In May 2013, Moody was charged with assault, threatening staff, and refusing an order and was sanctioned with 180 days of disciplinary custody. (*Id.* ¶ 65). Moody appealed the charge, which was upheld. (*Id.* ¶ 66).

In June 2013, Moody was charged with refusing to obey orders. (*Id.* ¶ 67).

In December 2013, Moody was charged with refusing multiple orders, threatening staff, and using abusive language, and was sanctioned with disciplinary custody. (*Id.* ¶ 68).

Between November 2013 and February 2014, a recommendation was passed among executive staff to continue Moody's placement on the RRL, and Wetzel signed to approve the recommendation. (*Id.* ¶ 69).

Between April and May 2014, a recommendation was passed among executive staff to continue Moody's placement on the RRL, and Wetzel signed to approve the recommendation. (*Id.* ¶ 70).

In June 2014, Moody was again charged with threatening staff, using abusive language, and refusing to obey an order. (*Id.* ¶ 71).

In July 2014, Moody was again charged with assault. (*Id.* ¶ 72).

In March 2015, Moody was charged with refusing to obey an order. (*Id.* ¶ 73).

In November 2015, Moody was charged with possession of contraband. (*Id.* ¶ 74).

Between February and June 2016, a recommendation was passed among executive staff to continue Moody's placement on the RRL, and Wetzel signed to approve the recommendation. (*Id.* ¶ 75).

In August 2016, Moody was placed in the Special Management Unit ("SMU") program as a "step-down" program, in an attempt to prepare him to re-enter general population. (*Id.* ¶ 76).

<u>Removal</u>

In July 2017, while in the SMU at SCI-Camp Hill, Moody was informed that he would not be processed for RRL removal until he completed Phase 2 of the SMU program. (*Id.* ¶ 77). Moody remained misconduct free and maintained positive behavior after reaching Phase 2 of the SMU program and obtained staff support for his removal from the RRL. (*Id.* ¶ 78). Moody was removed from the RRL in July 2017. (*Id.* ¶ 79).

In total, Moody was on the RRL for a little over five years. (*Id.* ¶ 80).

## II. ***<u>Legal Standard</u>***

Through summary adjudication, the court may dispose of those claims that do not present a "genuine dispute as to any material fact." FED. R. CIV. P. 56(a). "As to materiality, . . . [o]nly disputes over facts that might affect the outcome of the suit under the governing

law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

The party moving for summary judgment bears the burden of showing the absence of a genuine issue as to any material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Once such a showing has been made, the non-moving party must offer specific facts contradicting those averred by the movant to establish a genuine issue of material fact. *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888 (1990). Therefore, the non -moving party may not oppose summary judgment simply on the basis of the pleadings, or on conclusory statements that a factual issue exists. *Anderson*, 477 U.S. at 248. "A party asserting that a fact cannot be or is genuinely disputed must support the assertion by citing to particular parts of materials in the record...or showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." FED. R. CIV. P. 56(c)(1)(A)-(B). In evaluating whether summary judgment should be granted, "[t]he court need consider only the cited materials, but it may consider other materials in the record." FED. R. CIV. P. 56(c)(3). "Inferences should be drawn in the light most favorable to the non-moving party, and where the non-moving party's evidence contradicts the movant's, then the non-movant's must be taken as true." *Big Apple BMW, Inc. v. BMW of N. Am., Inc.*, 974 F.2d 1358, 1363 (3d Cir.1992), *cert. denied* 507 U.S. 912 (1993).

However, "facts must be viewed in the light most favorable to the nonmoving party only if there is a 'genuine' dispute as to those facts." *Scott v. Harris*, 550 U.S. 372, 380 (2007). If a party has carried its burden under the summary judgment rule,

> its opponent must do more than simply show that there is some metaphysical doubt as to the material facts. Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial. The mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact. When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment.

*Id.* (internal quotations, citations, and alterations omitted).

## III. <u>Discussion</u>

Defendants seek summary judgment on the following grounds: (1) Defendants are shielded from the state law claims by sovereign immunity and, alternatively, both state law claims fail as a matter of law; (2) Defendants Moore-Smeal and Wenerowicz must be dismissed due to a lack of personal involvement in the alleged wrongs; (3) Defendants are entitled to judgment on the Eighth Amendment deliberate indifference claim; (4) Defendants are entitled to judgment on the Fourteenth Amendment due process claims; (5) Defendants are entitled to judgment on the First Amendment retaliation claim; (6) Defendants are entitled to judgment on the ADA claim; (7) Defendants are shielded by qualified immunity; (8) the request for injunctive relief should be stricken as moot; and (9) the request for punitive damages should be stricken. (Doc. 205).

A. State Law Claims – Sovereign Immunity

Defendants seek an entry of summary judgment on Moody's state law claims, arguing that the doctrine of sovereign immunity bars these claims against state employees. (Doc. 205, at 12-14).

The Defendants (DOC employees) acting in their official capacities, are not "persons" as that term is used in Section 1983. *See Will v. Mich. Dep't of State Police*, 491 U.S. 58, 71 (1989) ("[N]either a State nor its officials acting in their official capacities are 'persons' under [Section] 1983."). Consequently, Moody cannot maintain a Section 1983 claim for money damages against any DOC Defendant in his or her official capacity.

Furthermore, Moody's Section 1983 official capacity claims are barred by the Eleventh Amendment, which provides that "[t]he Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State." U.S. Const. amend. XI. This Amendment

> has been interpreted to render states—and, by extension, state agencies and departments and officials when the state is the real party in interest—generally immune from suit by private parties in federal court. Indeed, it has been recognized for over two hundred years that a state's immunity from suit in federal court is a fundamental principle of our constitutional structure that preserves, as intended by the Framers, the respect and dignity of the states and protects the ability of the states "to govern in accordance with the will of their citizens."

*Pa. Fed'n of Sportsmen's Clubs, Inc. v. Hess*, 297 F.3d 310, 323 (3d Cir. 2002) (quoting *Alden v. Maine*, 527 U.S. 706, 751 (1999)).

Eleventh Amendment immunity extends to all state agencies, departments, and entities "having no existence apart from the state." *Laskaris v. Thornburgh*, 661 F.2d 23, 25 (3d Cir. 1981) (citation omitted). The DOC, as an agency of the Commonwealth of Pennsylvania, is entitled to the Commonwealth's Eleventh Amendment immunity, except in ten specific statutory exceptions, which are not applicable here.[3] *See* 71 P.S. § 61(a) ("The executive and administrative work of this Commonwealth shall be performed by the...Department of Corrections..."); *Lavia v. Pa., Dep't of Corr.*, 224 F.3d 190, 195 (3d Cir. 2000) (stating that "[b]ecause the Commonwealth of Pennsylvania's Department of Corrections is a part of the executive department of the Commonwealth, it shares in the Commonwealth's Eleventh Amendment immunity"); *see also Downey v. Pa. Dep't of Corr.*, 968 F.3d 299, 310 (3d Cir. 2020) (explaining that "state sovereign immunity prohibit[ed]" plaintiff's Section 1983 claims against the DOC).

Defendants are state officials for purposes of Section 1983. A suit for monetary damages against a state official in his or her official capacity "is not a suit against that official but rather is a suit against that official's office. As such, it is no different from a suit against the State itself." *Will*, 491 U.S. at 71 (internal citation omitted); *see also Kentucky v.*

---

[3] The ten categories for which sovereign immunity will not apply are: (1) vehicles in the possession or control of a Commonwealth party; (2) acts of health care employees of Commonwealth agency medical facilities or institutions; (3) the care, custody, or control of personal property; (4) a dangerous condition of Commonwealth agency real estate and sidewalks; (5) dangerous conditions of highways created by potholes or sinkholes; (6) the care, custody, or control of animals; (7) liquor store sales; (8) National Guard activities; (9) toxoids and vaccines, and (10) sexual abuse. *See* 42 PA. CONS. STAT. ANN. § 8522(b).

*Graham*, 473 U.S. 159, 165-66 (1985) ("Official-capacity suits…'generally represent only another way of pleading an action against an entity of which an officer is an agent.'" (quoting *Monell v. Dep't of Soc. Servs. of City of N.Y.*, 436 U.S 658, 690 n.55 (1978))). Therefore, Moody's official capacity claims for monetary damages against the Defendants are the equivalent of claims against the Commonwealth. *See Will*, 491 U.S. at 66, 70-71.[4] Defendants are entitled to an entry of summary judgment in this respect.

---

[4] There are three exceptions to Eleventh Amendment immunity: "1) congressional abrogation, 2) state waiver, and 3) suits against individual state officers for prospective relief to end an ongoing violation of federal law." *MCI Telecomm. Corp. v. Bell Atl. Pa.*, 271 F.3d 491, 503 (3d Cir. 2001). The third exception refers to the doctrine of *Ex parte Young*, 209 U.S. 123 (1908), under which "individual state officers can be sued in their individual capacities for prospective injunctive and declaratory relief to end continuing or ongoing violations of federal law." *MCI Telecomm.*, 271 F.3d at 506.

The first exception does not apply here, as the Commonwealth of Pennsylvania has not waived its Eleventh Amendment immunity. *See* 42 Pa. C.S. § 8521(b) ("Nothing contained in this subchapter shall be construed to waive the immunity of the Commonwealth from suit in Federal courts guaranteed by the Eleventh Amendment to the Constitution of the United States."). The second exception also does not apply here, as Congress did not intend to abrogate a state's Eleventh's Amendment immunity by enacting Section 1983. *See Quern v. Jordan*, 440 U.S. 332, 344-45 (1979).

As stated, with respect to the third exception, pursuant to *Ex parte Young*, the Eleventh Amendment does not bar suits against state officials in their official capacity seeking injunctive relief to end ongoing violations of federal law. *Koslow v. Commonwealth of Pennsylvania*, 302 F.3d 161, 178 (3d Cir. 2002) (citing *Kentucky v. Graham*, 473 U.S. 159, 167 n.14 (1985)). However, the doctrine of *Ex parte Young* does not apply to states or state agencies. *Puerto Rico Aqueduct & Sewer Auth. v. Metcalf & Eddy, Inc.*, 506 U.S. 139, 146 (1993). Those suits are barred "regardless of the relief sought." *Id.* The doctrine of *Ex parte Young* also does not apply to such claims against state officials, regardless of the relief sought. *Pennhurst State School & Hospital v. Halderman*, 465 U.S. 89, 121 (1984) ("a claim that state officials violated state law in carrying out their official responsibilities is…protected by the Eleventh Amendment")). The Third Circuit has held that "state officials are immune from suit in federal court based on violations of state law, including suits for prospective injunctive relief under state law, unless the state waives sovereign immunity." *Balsam v. Sec'y of N.J.*, 607 F. App'x 177, 183 (3d Cir. 2015) (citing *Pennhurst State School*, 465 U.S. at 106). Accordingly, the third exception does not apply here.

B. State Law Claims – Merits

**1. 37 Pa.Code § 93.11(b)**

Moody sets forth a violation of his rights under 37 Pa.Code § 93.11(b), (Doc. 45 ¶¶ 2, 106-108), which provides:

> Confinement in a restricted housing unit (RHU), *other than under procedures established for inmate discipline*, will not be done for punitive purposes. The Department will maintain written procedures which describe the reasons for housing an inmate in the RHU and require due process in accordance and with established principles of law for an inmate who is housed in the RHU. Inmates confined in the RHU will be reviewed periodically by facility staff.

37 Pa.Code § 93.11(b) (emphasis added). Specifically, Moody asserts that his rights under the above section of the Pennsylvania Code to be free from administrative custody and confinement were violated when Defendants "fail[ed] to adhere to the promulgated DOC policies before subjecting him to the most restrictive, cruel, unusual and atypical conditions of solitary confinement for well over 5 years." (Doc. 45 ¶ 107).

37 Pa.Code § 93.11(b) provides that confinement in the restricted housing unit will not be done for punitive purposes, *other than under procedures established for inmate discipline*. Moody was in fact being disciplined during his stay in the restrictive housing unit. He remained in the restrictive housing unit based upon the findings under DC-ADM 802, which indicated that Moody committed numerous assaults on staff, had a history of violence with other inmates, and a lack of respect towards staff direction and guidance. (Doc. 207-3, at 2-5).

Accordingly, Moody's attempt to base his claim on a violation of 37 Pa.Code § 93.11(b) when he was being disciplined must fail under the clear language of the Pennsylvania Code, and the Court will grant summary judgment as to this claim.

### 2. Abuse of Process

Moody also sets forth a state law claim of malicious abuse of process. (Doc. 45 ¶¶ 109-110). He asserts that Defendants "maliciously abused the administrative process by initiating it for the purpose of causing Mr. Moody significant harm to his physical and psychological well being knowing his vulnerability to self-harm propensities and the effects solitary confinement has on ones mental health and not for any legitimate security concerns." (Doc. 45 ¶ 110) (sic).

"It is well-settled that while an action for malicious prosecution can be maintained under § 1983, to state a viable claim, a plaintiff must establish that he was prosecuted." *Keim v. Cnty. of Bucks*, 275 F. Supp.2d 628, 634 (E.D. Pa. 2003) (citing *Losch v. Borough of Parkesburg,* 736 F.2d 903 (3d Cir. 1984)). The tort of abuse of process requires that the defendant: "(1) used a legal process against the plaintiff, (2) primarily to accomplish a purpose for which the process was not designed; and (3) harm has been caused to the plaintiff." *Shiner v. Moriarty*, 706 A.2d 1228, 1236 (Pa. Super. Ct. 1998) (internal citation omitted).

Moody bases his malicious abuse of process claim on the DOC "administrative process" utilized by Defendants. (Doc. 45 ¶ 110). Moody does not assert, or present any

evidence that Defendants used a legal process against him. Accordingly, the Court finds that Moody cannot state a cause of action for malicious abuse of process. The Court will grant summary judgment as to this claim.

C. Personal Involvement of Wenerowicz and Moore-Smeal

To impose liability upon a defendant in a section 1983 action, the plaintiff must show that the defendant had personal involvement in the wrongdoing. *Williams v. City of York*, 967 F.3d 252, 261 (3d Cir. 2020). Respondeat superior alone does not give rise to section 1983 liability. *Dooley v. Wetzel*, 957 F.3d 366, 374 (3d Cir. 2020) (citing *Rode v. Dellarciprete*, 845 F.2d 1195, 1207 (3d Cir. 1988)). An allegation that the defendant was responsible for supervising those involved, without more, is insufficient. *Rode*, 845 F.2d at 1208. Rather, liability must be demonstrated by showing that the defendant personally directed or, with actual knowledge, acquiesced in the conduct. *Dooley*, 957 F.3d at 374 (citing *Rode*, 845 F.2d at 1207). The plaintiff must describe the defendant's participation in or actual knowledge of and acquiescence in the wrongful conduct. *Chavarriaga v. N.J. Dep't of Corrs.*, 806 F.3d 210, 222 (3d Cir. 2015) (citing *Rode*, 845 F.2d at 1207). Constructive knowledge is not enough; the defendant must have had actual knowledge of the conduct. *Id.* (citing *Baker v. Monroe Twp.*, 50 F.3d 1186, 1194 (3d Cir. 1995)).

Defendants argue that Wenerowicz and Moore-Smeal were not personally involved in the alleged wrongs, as they had no part in Moody's placement on the RRL or continued placement on the RRL. (Doc. 205, at 18-19). In support of their argument, Defendants rely

on Moody's allegation in his second amended complaint that Defendant Wetzel was the only one who could place or remove him from the RRL. (*Id.*, citing Doc. 45 ¶ 62). In the second amended complaint, Moody alleges that "Defendant Wetzel is the Secretary of the DOC, it[]s highest-ranking DOC official. As such he was the only official with the authority to place and remove Moody from the RRL." (Doc. 45 ¶ 62).

However, Defendants have submitted the declaration of Defendant Moore-Smeal, wherein she attests as follows:

> My duties included voting to approve or deny preliminary recommendations to place inmates on the Restricted Release List ("RRL") and, if appropriate, to remove them from the RRL and transfer them back into the general population; however, the final decision for placement and removal was solely up to the Secretary.
>
> I was made aware of Brandon Moody, HQ9088, who I voted to approve the placement of on the RRL in 2012, and I decided to vote to continue his placement on the RRL every year through 2017; however the sole authority for placement or continuation on the RRL was held by the Secretary and not me.

(Doc. 206-5, ¶¶ 3-4).

Defendants have also submitted the declaration of Defendant Wenerowicz, wherein he attests as follows:

> I was not involved in the initial recommendation to place Brandon Moody, HQ9088 on the Restricted Release List ("RRL") in 2012, nor to recommend his removal from the RRL in 2017.
>
> To my knowledge, I was only involved with his annual review in 2016 and approved of the recommendation to continue his placement on the RRL at that time. I do not recall being involved in any other annual reviews.

(Doc. 206-7, ¶¶ 3-4).

Defendants have submitted evidence in the form of RRL Placement Sheets which clearly reflect that Defendants Wenerowicz and Moore-Smeal signed the forms approving Moody's continued placement on the RRL. (Doc. 207-3, at 5, 56, 63, 84).

In addition, Defendants have submitted various versions of DC-ADM 802 that were in effect from 2012 to 2017. (Doc. 206-6). Pursuant to those versions of DC-ADM 802, the Regional Deputy Secretary reviewed requests for an inmate to be placed on the RRL, and it was the duty of the Executive Deputy Secretary to review RRL placement and continuation. (*See, e.g.*, Doc. 206-6, at 7, DC-ADM 802 § 1(B)(3), (4) ("The Facility Manager/designee will provide written rationale supporting the request that an inmate be placed on the RRL, to the Regional Deputy Secretary via the Restricted Release List Placement/Annual RRL Review/Removal Request Form (Attachment 1- A). The form shall be initiated by the Unit Manager and forwarded to the CCPM, DSCS, DSFM, Facility Manager, the Regional Deputy Secretary, and the Executive Deputy Secretary indicating approval/disapproval to place an inmate on the Restricted Release List."... "The Executive Deputy Secretary will review the recommendation; indicate his/her approval or disapproval, and forward the Restricted Release List Placement/Annual RRL Review/Removal Request Form to the Secretary/designee for review. The Secretary/designee will make the final determination regarding the inmate's placement on the RRL.")).

Based on Defendants' own evidence, it is clear that Wenerowicz and Moore-Smeal had some level of involvement in Moody's placement or continued placement on the RRL. As such, the Court will deny Defendants' motion for summary judgment based on lack of personal involvement of Wenerowicz and Moore-Smeal.

D. Eighth Amendment Deliberate Indifference Claim

Moody avers that in violation of his Eighth Amendment rights, he was kept in solitary confinement for more than five consecutive years. (Doc. 45 ¶¶ 90-92). Moody asserts that he was subjected to constant illumination, excessive noise, harassment, lack of meaningful human contact, placement in a small cell, inadequate exercise, lack of vocational or educational activities, mandatory strip searches, lack of adequate mental health treatment, and intermittent lack of access to the law library, shower, non-contact visits, outside exercise and medical appointments. (*Id.* ¶¶ 1, 21-36, 92). He contends that there was no "justifiable penological purpose" for subjecting him to these conditions. (*Id.* ¶ 92(a)).

The Supreme Court has held that "[i]t is well settled that the decision where to house inmates is at the core of prison administrators' expertise." *McKune v. Lile*, 536 U.S. 24, 39 (2002). Thus, a transfer of a prisoner to the RHU or RRL alone does not violate the Eighth Amendment. *See Williams v. Armstrong*, 566 F. App'x 106, 109 (3d Cir. 2014) (because the Eighth Amendment applies only when a deprivation results in the denial of "the minimal civilized measure of life's necessities," placement of prisoner in RHU for 112 days alone, without allegation that he was denied life's necessities, did not state a claim for relief);

*Griffin v. Vaughn*, 112 F.3d 703, 709 (3d Cir. 1997); *Gibson v. Lynch*, 652 F.2d 348, 352 (3d Cir. 1981). Nor does mere placement of an inmate in AC status or on the RRL alone violate the Eighth Amendment. *See Bramble v. Wetzel*, 2022 WL 55021, at *7 (M.D. Pa. Jan. 5, 2022).

In order to maintain a claim under the Eighth Amendment, a prisoner must show that: (1) he was subjected to a deprivation that was "objectively, sufficiently serious; a prison official's act or omission must result in the denial of the minimal civilized measure of life's necessities"; and (2) a prison official must have acted with "deliberate indifference to a prisoner's...needs," which occurs only if the official "knows of and disregards an excessive risk to inmate health or safety." *Farmer v. Brennan*, 511 U.S. 825, 834, 837 (1994). To meet the objective component, the inmate must show that the condition, either alone or in combination with other conditions, deprived him of "the minimal civilized measure of life's necessities," *Farmer*, 511 U.S. at 834 (citation omitted), or a "single, identifiable human need," *Wilson v. Seiter*, 501 U.S. 294, 304 (1991); *see Hudson v. McMillian*, 503 U.S. 1, 9 (1992) (only "extreme deprivations" are sufficient to make out an Eighth Amendment claim). These needs include "food, clothing, shelter, sanitation, medical care and personal safety." *Griffin*, 112 F.3d at 709. To satisfy the subjective prong of the Eighth Amendment test, an inmate must show that the prison official "knows that inmates face a substantial risk of serious harm and disregards that risk by failing to take reasonable measures to abate it." *Chavarriaga*, 806 F.3d at 229 (quoting *Farmer*, 511 U.S. at 847). The inmate "may

demonstrate deliberate indifference by showing that the risk of harm was longstanding, pervasive, well documented, or expressly noted by prison officials in the past such that defendants must have known about the risk." *Betts v. New Castle Youth Dev. Ctr.*, 621 F.3d 249, 259 (3d Cir. 2010) (quoting *Farmer*, 511 U.S. at 842-43) (internal quotation marks omitted). In evaluating this prong, the court "may also consider whether officials 'had a legitimate penological purpose' behind their conduct." *Porter v. Pa. Dep't of Corr.*, 974 F.3d 431,446 (3d Cir. 2020) (citation omitted) ("The Eighth Amendment prohibits punishments without penological justification.").

An inmate is not entitled to relief simply because of exposure to uncomfortable or inconvenient conditions of confinement. *Rhodes v. Chapman*, 452 U.S. 337,347 (1981). "Where conditions are not 'cruel and unusual' but merely 'restrictive and even harsh,' they do not violate the Eighth Amendment but rather 'are part of the penalty that criminal offenders pay for their offenses against society.'" *Washington v. Wetzel*, 2022 WL 1782509, at *7 (W.D. Pa. June 1, 2022) (quoting *Rhodes*, 452 U.S. at 347). Thus, "so long as the conditions of that confinement are not foul or inhuman, and are supported by some penological justification, they will not violate the Eighth Amendment." *Thomas v. Tice*, 948 F.3d 133, 139 (3d Cir. 2020); *see Tillery v. Owens*, 907 F.2d 418, 426 (3d Cir. 1990) ("the prison environment itself may not be so brutal or unhealthy as to be in itself a punishment"). Where, as here, an inmate's claim concern a segregated housing unit, "[t]he touchstone is the health of the inmate," and the court must consider both "[t]he duration and conditions of

segregated confinement" to determine the constitutionality of that confinement. *Young v. Quinlan*, 960 F.2d 351,364 (3d Cir. 1992), *superseded by statute on other grounds as stated in Nyhuis v. Reno*, 204 F.3d 65, 71 n.7 (3d Cir. 2000).

Defendants contend that Moody cannot satisfy either the objective or subjective component of a conditions of confinement claim. (Doc. 205, at 20-24). Defendants argue that, with respect to the objective factor, none of the complained-of conditions are so sufficiently serious to satisfy the objective requirement for an Eighth Amendment claim. (*Id.* at 20-22); *see, e.g.*, *Bramble*, 2022 WL 55021, at *8 ("while we recognize that Bramble remained in Administrative Custody on the RRL for over two years before he was returned to the Delaware DOC, Bramble has not set forth any evidence tending to show that his confinement in Administrative Custody denied him 'the minimal civilized measure of life's necessities,' or that there was no legitimate penological objective for his placement in Administrative Custody."). Defendants also argue that they had no reason to suspect that Moody suffered from a serious mental illness, and there is no evidence that prison conditions posed an unreasonable risk of serious damage to his current or future physical or mental health. (Doc. 205, at 22-25).

Viewing the record and all reasonable inferences to be drawn therefrom in Moody's favor, the Court finds that there is a genuine dispute as to whether his conditions of confinement caused an objectively, sufficiently serious deprivation.

The Court first recognizes that Moody's placement in the RHU and on the RRL does not in and of itself constitute an unconstitutional condition of confinement. *See Young*, 960 F.2d at 364 ("Segregated detention is not cruel and unusual punishment *per se*, as long as the conditions of confinement are not foul, inhuman or totally without penological justification."); *Hutto v. Finney*, 437 U.S. 678, 686 (1978) ("It is perfectly obvious that every decision to remove a particular inmate from the general prison population for an indeterminate period could not be characterized as cruel and unusual."); *Johnson v. Wetzel*, 209 F. Supp.3d 766, 777 (M.D. Pa. 2016) ("a prisoner's placement in solitary confinement does not, in itself, violate the Constitution").

However, the evidence reflects that a reasonable jury could conclude that Moody's confinement in the RHU denied him the minimal civilized measure of life's necessities, and could conclude that he was denied "adequate food, clothing, shelter, and medical care," or was housed in unsafe conditions. *Farmer*, 511 U.S. at 832. As stated, Moody asserts that he was held in solitary confinement for over five years and subjected to constant illumination, excessive noise, harassment, lack of meaningful human contact, placement in a small cell, complete denial of access to exercise equipment, lack of vocational or educational activities, mandatory strip searches, lack of adequate mental health treatment, intermittent lack of access to the law library, inadequate access to showers and hygiene products, non-contact visits, inadequate outside exercise, and inadequate medical appointments. (Doc. 45 ¶¶ 1, 21-38, 44-45, 92). He maintains that he spent approximately

24 hours a day in his cell. (*Id.* ¶ 21). Moody avers that these conditions caused numerous physical and mental health ailments. (*Id.* ¶¶ 37, 41).

The record reflects that Moody was seen weekly in the RHU, and was seen periodically by the PRC, which provided a forum to address issues he experienced in the RHU. (Doc. 207-3, at 37-41, 66-70, 93-97). The records show that Moody reported that staff was harassing him and retaliating against him, his mental health was deteriorating, he could not communicate with his attorney, he was denied phone calls, he refused to eat and was placed in a POC. (*Id.*). However, on several occasions, Moody also expressed no concerns and reported that he was "okay[,]" and refused psychiatry visits. (*Id.*). The record also shows that the PRC granted Moody additional privileges during his time in the RHU, such as a radio, typewriter, television, extended commissary, use of a kiosk for email, phone calls, a cup inside his cell, and in-cell programming. (*Id.* at 67). This conflicting evidence creates a genuine dispute of fact precluding an entry of summary judgment in favor of Defendants.

A reasonable juror could find that, over the course of five-plus years, spending 24 hours a day in a cell, subjected to the conditions imposed on Moody—alone or in combination—could create a substantial risk of serious harm or could have deprived Moody of the minimal civilized measure of life's necessities. Moody's assertions are sufficient to create a genuine issue of material fact as to whether his conditions of confinement violated the Eighth Amendment; therefore, summary judgment in favor of Defendants will be denied.

As to the subjective component of Moody's Eighth Amendment claim, there is no question that prolonged solitary confinement may pose risks to an inmate's mental health. *See Palakovic v. Wetzel*, 854 F.3d 209, 225-26 (3d Cir. 2017); *Johnston v. Wetzel*, 431 F. Supp. 3d 666, 677-78 (W.D. Pa. 2019). Defendants argue that they "had no reason to suspect that Moody suffered from a serious mental illness." (Doc. 205, at 22).

The record reveals that Defendants Wetzel, Moore-Smeal, and Wenerowicz each signed forms recommending or approving Moody's continued placement on the RRL. (Doc. 207-3, at 3, 5, 56, 63, 64, 84). These forms note that Moody has a Mental Health Stability Code of C—"which indicates that the inmate has a mental health history and requires mental health services and is followed by the Psychiatric Review Team (PRC)." (*Id.* at 3, 6, 57, 72, 87). In one review wherein Defendant Wetzel recommended continuing Moody's placement on the RRL, Wetzel noted that "Moody is a C-roster inmate who has previously been diagnosed with Malingering, Drug Dependence, Antisocial Personality Disorder, and Noncompliance with Treatment. Psych staff notes there are no psychological disturbances and that Moody is no longer on psychotropic medication after he received his November 2015 misconduct for hoarding it." (*Id.* at 87). Thus, there is evidence of record indicating that Defendants knew facts from which they could have inferred that Moody's mental health could be affected by placement in the RHU and on the RRL.

Thus, there are material issues of fact that preclude summary judgment regarding whether Defendants acted with a "sufficiently culpable state of mind" as it relates to

Moody's status, and if the conditions experienced by Moody were serious enough to violate the Constitution. The Court will deny Defendants' motion for summary judgment on the Eighth Amendment Claim.

E. Fourteenth Amendment Due Process Claims

**1. Substantive Due Process Claim**

To the extent that Moody is attempting to assert a substantive due process claim regarding his placement in administrative custody, such a claim is barred by the more-specific-provision rule. (Doc. 45 ¶¶ 103-105).

The Due Process Clause of the Fourteenth Amendment to the United States Constitution contains both procedural and substantive protections. *See* U.S. Const. amend. XIV, § 1. The substantive component of the Due Process Clause safeguards against certain deprivations of individuals' "life, liberty, and property" by state actors "regardless of the fairness of the procedures used to implement them." *L.R. v. Sch. Dist. Of Phila.*, 836 F.3d 235, 241 (3d Cir. 2016) (quoting *Collins v. City of Harker Heights*, 503 U.S. 115, 125 (1992)). A substantive due process claim, however, cannot be maintained when the alleged constitutional violation is "covered by a specific constitutional provision, such as the Fourth or Eighth Amendment." *Porter*, 974 F.3d at 447 (quoting *United States v. Lanier*, 520 U.S. 259, 272 n.7 (1997)). In such situations, the claim must be analyzed under the rubric of the more specific constitutional provision rather than substantive due process, *see id.*, as substantive due process is an "unchartered area" with "scarce and open-ended" guideposts,

*Collins*, 503 U.S. at 125. The "more-specific-provision rule" will often apply when the challenged conduct underlying the substantive due process claim is the same conduct that implicates a more explicit constitutional provision. *See Porter*, 974 F.3d at 448.

Insofar as Moody is asserting a substantive due process claim for his placement in administrative custody, that claim is barred by the more-specific-provision rule, and is covered by the Eighth Amendment. The Court will grant summary judgment to Defendants with respect to Moody's Fourteenth Amendment substantive due process claim.

**2. Procedural Due Process Claim**

The due process analysis starts with determining whether the liberty interest asserted is protected by the Fourteenth Amendment. *Montanez v. Sec'y Dep't of Corr.*, 773 F.3d 472, 482-83 (3d Cir. 2014) (quoting *Evans v. Sec'y Pa. Dep't of Corr.*, 645 F.3d 650, 663 (3d Cir. 2011)); *see also Holland v. Rosen*, 895 F.3d 272, 297 (3d Cir. 2018) (citations omitted). If it is a protected interest, the Court must then determine what process is necessary to protect it. *Newman v. Beard*, 617 F.3d 775, 783 (3d Cir. 2010) (citation omitted). If the interest is not protected, no process is necessary. Hence, as a threshold matter, the plaintiff must establish that he had a protected liberty interest. *See Fraise v. Terhune*, 283 F.3d 506, 522 (3d Cir. 2002) (finding that succeeding on a due process claim requires demonstrating that the plaintiff was deprived of a liberty interest).

Prisoners do not enjoy the same liberty interests as others do. *See Sandin v. Conner*, 515 U.S. 472, 485 (1995). Incarceration "brings about the necessary withdrawal or

limitation of many privileges and rights, a retraction justified by the considerations underlying our penal system." *Id.* (quoting *Jones v. N.C. Prisoners' Labor Union, Inc.*, 433 U.S. 119, 125 (1977)). "To rise to the level of a liberty interest, the right alleged must confer 'freedom from restraint which…imposes *atypical and significant hardship* on the inmate in relation to the ordinary incidents of prison life.'" *Williams v. Sec'y Pa. Dep't of Corr.*, 848 F.3d 549, 559 (3d Cir. 2017) (emphasis in *Williams*) (quoting *Griffin*, 112 F.3d at 708). "As long as the conditions or degree of confinement to which the prisoner is subjected is within the sentence imposed upon him and is not otherwise violative of the Constitution, the Due Process Clause does not in itself subject an inmate's treatment by prison authorities to judicial oversight." *Montayne v. Haymes*, 427 U.S. 236, 242 (1976).

The question is whether Moody has established that his more than five years in the RHU and on the RRL imposed an atypical and significant hardship. In making this determination, the Court considers: "(1) the duration of the challenged conditions; and (2) whether the conditions overall imposed a significant hardship in relation to the ordinary incidents of prison life." *Williams*, 848 F.3d at 560 (citing *Shoats v. Horn*, 213 F.3d 140, 144 (3d Cir. 2017)). Prolonged, indefinite solitary confinement may impose an atypical and significant hardship. *Shoats*, 213 F.3d at 144.

The Court first considers the duration of Moody's placement on the RRL and segregation in RHU. There is no bright line defining where the duration of segregation becomes atypical. *Williams*, 848 F.3d at 561-62. In *Shoats*, the Third Circuit found that

eight years in administrative confinement was "not only atypical, but is indeed 'unique,'" 213 F.3d at 144, while the Third Circuit in *Smith v. Mensinger* found that seven months in disciplinary confinement was not, 293 F.3d 641, 654 (3d Cir. 2002), and the Third Circuit in *Griffin* found that 15 months in administrative custody was not, 112 F.3d at 708 (holding that "exposure to the conditions of administrative custody for periods as long as 15 months 'falls within the expected parameters of the sentence imposed...by a court of law'").

It is possible that Moody's five-plus years in specialized units may be considered atypical. In November 2012, following an altercation with staff, Moody was removed from general population and placed in solitary confinement. (Doc. 45 ¶ 18). He was placed on RRL status in January 2013 and was removed from the RRL in July 2017. (Doc. 207-3, at 40, 90; Doc. 204 ¶¶ 25, 79).

To determine whether an inmate's conditions constitute a "dramatic departure" from the accepted standards for confinement, *Sandin*, 515 U.S. at 485, courts in the Third Circuit look to factors including: the amount of time the inmate is confined to his cell each day, whether the inmate eats meals by himself, his contact with family and individuals other than DOC officials, access to natural light and outdoor activities, and the opportunity to participate in educational, vocational, religious, and organizational activities. *Shoats*, 213 F.3d at 144 (finding significant hardship where inmate was confined in "virtual isolation" for eight years with no prospect of release, was confined to cell 23-24 hours a day, ate meals alone, had no contact with family, was prohibited from participating in prison activities, and

his sole contact was with DOC officials). As set forth above, this Court has determined that a reasonable juror could conclude that Moody's conditions of confinement rose to the level of cruel and unusual, and the Court likewise finds that a reasonable juror could conclude that those conditions imposed an atypical and significant hardship necessary to implicate a protected liberty interest.

When an inmate's continued placement on the RRL in segregated confinement implicates a protected liberty interest, due process requirements are met by "the periodic review offered to Pennsylvania inmates who are indefinitely confined in administrative confinement." *Bracey v. Pa. Dep't of Corr.*, 686 F. App'x 130, 135 (3d Cir. 2017). "The reviews must be meaningful in the sense that the review is not conducted in 'rote fashion,' becoming an ostensible mechanism for indefinite restrictive confinement. They must also be periodic in the sense that they are conducted with such frequency that the reasons justifying the confinement are 'current.'" *Watson v. Wetzel*, 2024 WL 5096209, at *10 (E.D. Pa. Dec. 12, 2024) (citations omitted).

The undisputed evidence demonstrates that, following his placement on the RRL in 2013, Moody was seen by the PRC at periodic reviews on the following dates—January 24, 2013, April 18, 2013, May 30, 2013 (PRC meeting to discuss misconduct), July 11, 2013, July 12, 2013 (PRC meeting to discuss misconduct), July 26, 2013 (yearly review), April 18, 2015, June 11, 2015, July 9, 2015, July 23, 2015, August 18, 2015, August 27, 2015, September 10, 2015, September 17, 2015, October, 28, 2015, November 24, 2015,

December 22, 2015, December 31, 2015, January 7, 2016, January 21, 2016, January 28, 2016, February 4, 2016, February 11, 2016, February 18, 2016, February 24, 2016, March 2, 2016, April 7, 2016, May 4, 2016, May 25, 2016, June 15, 2016, June 22, 2016, July 21, 2016, August 4, 2016, September 28, 2016, October 26, 2016, December 22, 2016, December 28, 2016, January 19, 2017, March 15, 2017, and April 12, 2017. (Doc. 207-3, at 37-41, 66-70, 93-97).

While the record reflects that Moody received several periodic reviews to which he was due, there is a lapse between July 2013 and April 18, 2015, and April 12, 2017 and July 2017 (when he was removed from the RRL). The record does not contain any evidence that Moody received, or did not receive, PRC reviews during these time periods. Thus, there are material issues of fact that preclude summary judgment regarding whether Moody received periodic, meaningful reviews.

F. First Amendment Retaliation Claim

To state a retaliation claim under the First Amendment, a plaintiff bears the burden of satisfying three elements. First, a plaintiff must prove that he was engaged in constitutionally protected activity. *See Rauser v. Horn*, 241 F.3d 330, 333 (3d Cir. 2001). Second, a plaintiff must demonstrate that he "suffered some 'adverse action' at the hands of prison officials." *Id.* (quoting *Allah v. Seiverling*, 229 F.3d 220, 225 (3d Cir. 2000)). This requirement is satisfied by showing adverse action "sufficient 'to deter a person of ordinary firmness' from exercising his First Amendment rights." *Id.* (quoting *Suppan v. Dadonna*, 203

F.3d 228, 235 (3d Cir. 2000)). Third, a prisoner must prove that "his constitutionally protected conduct was 'a substantial or motivating factor' in the decision to discipline him." *Rauser*, 241 F.3d at 333-34 (quoting *Mount Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 287 (1977)). This third element is often referred to as "causation."

There are different ways to prove causation for a First Amendment retaliation claim. One method is to show "unusually suggestive" timing between the protected conduct and the adverse action. *See Lauren W. ex rel. Jean W. v. DeFlaminis*, 480 F.3d 259, 267 (3d Cir. 2007). When a plaintiff relies solely on circumstantial evidence of temporal proximity at summary judgment, the time between the protected conduct and the adverse action is often measured in days rather than weeks or months. *See Conard v. Pa. State Police*, 902 F.3d 178, 184 (3d Cir. 2018). However, "there is not a bright line rule limiting the length of time that may pass between a plaintiff's protected speech and an actionable retaliatory act by a defendant." *Id.* Another approach is to demonstrate "a pattern of antagonism coupled with timing." *DeFlaminis*, 480 F.3d at 267. Finally, causation can be inferred "from the evidence gleaned from the record as a whole." *Watson v. Rozum*, 834 F.3d 417, 424 (3d Cir. 2016) (citing *Farrell v. Planters Lifesavers Co.*, 206 F.3d 271, 281 (3d Cir. 2000)). A plaintiff asserting retaliation "will have to show…that the decision maker had knowledge of the protected activity[.]" *Moore v. City of Philadelphia*, 461 F.3d 331, 351 (3d Cir. 2006) (citation omitted).

If a prisoner establishes a *prima facie* case of retaliation, the burden shifts to prison officials to show, by a preponderance of the evidence, that "they would have made the same decision absent the protected conduct for reasons reasonably related to a legitimate penological interest." *Rauser*, 241 F.3d at 334. "This is often referred to as the 'same decision defense." *Watson*, 834 F.3d at 422. If the prison officials can make this showing, it defeats the retaliation claim. *See Carter v. McGrady*, 292 F.3d 152, 159 (3d Cir. 2002).

Defendants argue that "Moody can only meet the first prong." (Doc. 205, at 25-27). The record proves otherwise.

As to the first element of *Rauser*, Moody has established that he was engaged in constitutionally protected activity by filing a lawsuit against Wetzel. *See Mearin v. Vidonish*, 450 F. App'x 100, 102 (3d Cir. 2011) ("the filing of grievances and lawsuits against prison officials constitutes constitutionally protected activity") (citation omitted).

With respect to the second *Rauser* element, courts have held that placement on the RRL can meet the adverse action element because of its more restrictive conditions compared to other aspects of prison life. *See Mitchell v. Horn*, 318 F.3d 523, 530 (3d Cir. 2003) ("several months in disciplinary confinement would deter a reasonably firm prisoner from exercising his First Amendment rights"); *Jackson v. Carter*, 2017 WL 4326107, at *3 (W.D. Pa. July 10, 2017), *report and recommendation adopted sub nom. Jackson v. PA Dep't of Corr.*, 2017 WL 4296809 (W.D. Pa. Sept. 26, 2017).

The third *Rauser* prong requires a prisoner to prove that his constitutionally protected conduct was a substantial or motivating factor in the decision to discipline him. Moody initiated his lawsuit in the Commonwealth Court of Pennsylvania against Wetzel (and other non-defendant individuals) on September 27, 2012. (Doc. 206-11). By Order dated October 11, 2012, the matter was transferred to the Northumberland Court of Common Pleas Court. (*Id.*). Then, on January 24, 2013, Moody was notified at a PRC meeting that he was placed on the RRL. (Doc. 207-3, at 41). With respect to Defendant Wetzel, the record supports a reasonable inference of retaliatory motive connecting Moody's protected activity with his placement on the RRL.

However, nothing in the record before the Court would permit a finding that Defendants Moore-Smeal and Wenerowicz were aware of the prior lawsuit filed by Moody. *See Daniels v. Sch. Dist. of Phila.*, 776 F.3d 181, 196-97 (3d Cir. 2015) (noting that a plaintiff "cannot establish that there was a causal connection without some evidence that the individuals responsible for the adverse action knew of the plaintiff's protected conduct at the time they acted"). It is well-settled that causation cannot be inferred simply by asserting that a plaintiff pursued some protected activity (like filing a lawsuit) against a defendant or nonparty prison official who is not the alleged perpetrator of the retaliatory adverse action. *See, e.g.*, *Nunez v. Wetzel*, No. 1:21-cv-01484, 2023 WL 2385931, at *5 (M.D. Pa. Mar. 6, 2023) (collecting cases); *Evans v. Rozum*, No. 07-cv-230J, 2009 WL 5064490, at *22 (W.D. Pa. Dec. 17, 2009) ("[T]here is no apparent reason why [the moving defendants] would want

to retaliate against Plaintiff for filing a lawsuit against others." (second alteration in original)); *Royster v. Beard*, No. 1:06-cv-0842, 2008 WL 2914516, at *6 (M.D. Pa. July 24, 2008) (concluding that plaintiff failed to satisfy the causal connection for his retaliation claim against defendant because previous grievance did not name or impact that defendant), *aff'd* 308 F. App'x 576 (3d Cir. 2009) (nonprecedential). Any speculation on Moody's part is insufficient to defeat summary judgment. *See Wharton v. Danberg*, 854 F.3d 234, 244 (3d Cir. 2017). Moody has failed to present evidence establishing a causal link between his protected conduct and the actions of Defendants Moore-Smeal and Wenerowicz. Defendants Moore-Smeal and Wenerowicz are entitled to judgment in their favor on the retaliation claim.

G. Americans with Disabilities Act Claim

In addition to his constitutional and state law claims, Moody asserts that that his placement on the RRL excluded him from participating in behavioral and mental health treatment programs offered to other seriously mentally ill prisoners, in violation of the ADA. Title II of the ADA provides that:

> Subject to the provisions of this subchapter, no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity.

42 U.S.C. § 12132. Public entities under the ADA can include state correctional institutions. *See Pennsylvania Dep't of Corr. v. Yeskey*, 524 U.S. 206, 210 (1998); *Chisolm v. McManimon*, 275 F.3d 315, 625 (3d Cir. 2001). While the Third Circuit has not addressed

the issue precedentially, most courts "have held that Title II does not authorize suits against government officers in their individual capacities." *Williams v. Hayman*, 657 F. Supp. 2d 488. 502 (D.N.J. 2008); *see also Kokinda v. Pennsylvania Dep't of Corr.*, 779 F. App'x 938, 942 (3d Cir. 2019) (concluding that plaintiff's "claims for individual damages liability under Title II of the ADA fail for the simple reason that there is no such liability") (citations omitted); *Bowens v. Wetzel*, 674 F. App'x 133, 136 (3d Cir. 2017) (noting that "the District Court could have properly followed the holdings of those circuits which have concluded that there is no individual damages liability under Title II of the ADA, which provides an additional basis to affirm the dismissal of this claim"); *Matthews v. Pa. Dep't of Corr.*, 613 F. App'x 163, 169-70 (3d Cir. 2015) (agreeing with the Second and Eighth Circuits that "Title II of the ADA does not provide for suits against state officers in their individual capacities"). Thus, Moody's claims under Title II of the ADA Act fail to the extent asserted against the individual Defendants, because these statutes do not provide for liability against individuals.

However, Moody also asserts his claims against the Defendants in their official capacities. (Doc. 45 ¶ 9). Moody's ADA claim fails because he has not presented any evidence that he was deprived of any benefit *because of* his disability. To state a claim for a violation of the ADA, a plaintiff must allege that they were precluded from receiving a service *because* of an alleged disability. Specifically, the Third Circuit held:

> To establish a violation of Title II of the ADA, an inmate must allege that: (1) he is a qualified individual with a disability; (2) he was either excluded from participation in or denied the benefits of some public entity's services,

> programs, or activities; and (3) such exclusion, denial of benefits, or discrimination was by reason of his disability. *See* 42 U.S.C. § 12132.

*Brown v. Deparlos*, 492 F. App'x 211, 215 (3d Cir. 2012). Moody asserts that he has been diagnosed as "a person…with serious mental illnesses," and that he was deprived of "therapeutic services from the mental health department during his tenure in solitary confinement." (Doc. 45 ¶ 94). He asserts that he was precluded from accessing these programs because of his placement on the RRL, not because of his mental illness. (*Id.*). Moody has not presented any evidence that he was deprived of any benefit *because of* his disability. 42 U.S.C. § 12132. Therefore, Moody's claims under the ADA fail as a matter of law, and Defendants' motion will be granted as to this claim.

H. Qualified Immunity

The doctrine of qualified immunity protects a state actor who has committed a constitutional violation if the plaintiff's rights were not "clearly established" when the individual acted. *Pearson v. Callahan*, 555 U.S. 223, 244-45 (2009). "Qualified immunity balances two important interests—the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." *Id.* at 231. "Thus, so long as an official reasonably believes that his conduct complies with the law, qualified immunity will shield that official from liability." *Sharp v. Johnson*, 669 F.3d 144, 159 (3d Cir. 2012) (citing *Pearson*, 555 U.S. at 244). The burden to establish qualified immunity rests with the

defendant claiming its protection. *Beers-Capitol v. Whetzel*, 256 F.3d 120, 142 n.15 (3d Cir. 2001).

A qualified immunity determination involves a two-pronged inquiry: (1) whether a constitutional or federal right has been violated; and (2) whether that right was "clearly established" at the time of the alleged violation. *Saucier v. Katz*, 533 U.S. 194, 201 (2001), *overruled in part by Pearson*, 555 U.S. at 236 (permitting federal courts to exercise discretion in deciding which of the two *Saucier* prongs should be addressed first).

Defendants argue that they are entitled to qualified immunity because they did not violate Moody's constitutional rights, and because they could not have known that their actions were in violation of clearly established law in effect in late 2012 and early 2013 when Moody was placed on the RRL. (Doc. 205, at 10-12).

For the reasons outlined above and based on the record in this case, there are genuine issues of material fact as to whether Moody has been denied his First, Eighth Amendment, and Fourteenth Amendment rights. Therefore, Defendants are not entitled to qualified immunity at this time.

I. Request for Injunctive Relief

Moody seeks injunctive relief in the form of removal from "solitary confinement or other similar conditions." (Doc. 45, at 21). It is undisputed that Moody has been removed from the RRL. Article III of the Constitution provides that the judicial power of the United States shall extend to "cases" and "controversies." U.S. Const., art. III, § 2. "[F]ederal

courts may adjudicate only actual, ongoing cases or controversies," *Lewis v. Cont'l Bank Corp.*, 494 U.S. 472, 477 (1990), and "[i]t is a basic principle of Article III that a justiciable case or controversy must remain 'extant at all stages of review, not merely at the time the complaint is filed,'" *United States v. Juvenile Male*, 564 U.S. 932, 936 (2011) (citation omitted). Because Moody is no longer on the RRL, he does not present a live case or controversy for injunctive relief regarding removal from the RRL. This request will be stricken.

J. Claim for Damages

Moody seeks punitive damages. (Doc. 45, at 21). Defendants argue that Moody cannot seek punitive damages because he failed to submit evidence that Defendants acted with an evil motive or intent. (Doc. 205, at 28-29). Considering the Court's determination that the First, Eighth, and Fourteenth Amendment claims shall proceed, the Court declines to strike the claim for punitive damages and will not delve into the factual determinations required for an award of punitive damages at this stage.

## IV. Conclusion

Consistent with the foregoing, Defendants' Rule 56 motion will be granted in part and denied in part. (Doc. 203). A separate Order shall issue.

Robert D. Marlani
United States District Judge

Dated: September 21, 2026